**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| Brenda Elaine Glover, | ) | |
| | ) | Civil Action No. 4:10-1829-MBS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On July 14, 2010, Plaintiff Brenda Elaine Glover filed the within action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, as amended (the "Act") seeking judicial review of a final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Thomas E. Rogers, III, for pretrial handling. On February 3, 2011, Plaintiff filed her brief addressing the issues in the case. On March 15, 2011, Defendant filed a Memorandum in Support of the Commissioner's decision. On June 30, 2011, the Magistrate Judge filed a Report and Recommendation recommending that the Commissioner's decision to deny benefits be affirmed. On July 19, 2011, Plaintiff filed objections to the Report and Recommendation. On July 26, 2011, Defendant responded to Plaintiff's objections.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the

Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1). The district court is obligated to conduct a *de novo* review of every portion of the Magistrate Judge's report to which objections have been filed. *Id.*

## I. FACTS

On May 3, 2006, Plaintiff filed applications for DIB and SSI, alleging disability beginning on April 13, 2006. R. at 146-152. Plaintiff alleges she is disabled due to "seizure/blood disease/kidney prbl/hbp." R. at 159. Plaintiff's claims were denied initially and upon reconsideration. R. at 77, 79, 81, 82. On August 20, 2008, a hearing was held before an administrative law judge ("ALJ") at which Plaintiff and a vocational expert testified. R. at 21. On October 1, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. R. at 7-20. On May 19, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. R. at 1. As a result, the ALJ's decision became the final decision of the Commissioner. *Id.*

**A.     Plaintiff's Work History**

On May 26, 2006, Plaintiff completed a work history report stating that she had past work as a draper and made "drapes, window treatments, pillows, bedding and accessories" from 1985 to April 2006. R. at 167-68. Plaintiff states that her work as a draper required her to walk one hour per day; stand eight hours per day; sit 4 hours per day; stoop one hour per day; handle, grab or grasp big objects two hours per day; and write, type, or handle small objects two hours per day. R. at 168. Plaintiff states that the her job required her to lift bolts of fabric to and from workstations; and handle, move and cut wood and lumber pieces. *Id.* Plaintiff states that she frequently lifted twenty-five pounds during a work day, and has lifted up to fifty pounds. *Id.*

2

**B.    Plaintiff's Medical Records**

Plaintiff's earliest medical record that was submitted to the ALJ is from March 5, 2004. On this date, Plaintiff presented to Dr. Dana A. Kumjian, M.D. ("Kumjian") for follow-up. R. at 363. Kumjian's impression was that Plaintiff had accelerated hypertension, and that Plaintiff should "restart all of her medicines and to try and maintain compliance." *Id.*

Plaintiff was admitted to Candler Hospital on April 13, 2006 due to "renal failure with marked thrombocytopenia" after going to the Hilton Head Emergency Room with midepigastric pain. R. at 289. Plaintiff "was noted to have a platelet count of only 7,000 with an elevated BUN at 39 and creatine of 2.7." *Id.* Plaintiff's History and Physical Report from Candler Hospital, dated April 14, 2006, describes Plaintiff as a "53 year old black female hypertensive with chronic kidney disease and a baseline plasma creatine of 2.3 mg per deciliter . . . ." *Id.* Plaintiff's past medical history was listed as: (1) chronic kidney disease; (2) history of mixed connective tissue disease since 03/1990; (3) hypertension since 04/01/1996; (4) hyperlipidemia; and (5) obesity. *Id.* Plaintiff complained of a "chronic headache" and weakness. *Id.* Kumjian noted that Plaintiff had psychomotor retardation. R. at 291. Kumjian also noted that Plaintiff "has a longstanding history of noncompliance" and that Plaintiff had "basically stopped all of her medication . . . which is her usual behavior." *Id.* Plaintiff was diagnosed with thrombotic thrombocytopenic purpura ("TTP"). Kumjian concluded that Plaintiff also had altered mental status secondary to TTP. R. at 291. Kumjian planned to start Plaintiff on plasmapheresis for TTP. *Id.*

On April 14, 2006, Plaintiff underwent several evaluations and tests. R. at 287-88, 271, 327-30, 281-81. Plaintiff was evaluated for chest pain, and Dr. Robert C. Rollings ("Rollings") concluded that Plaintiff had left ventricular hypertrophy repolarization changes. R. at 287. Plaintiff

3

also had a chest exam that concluded that Plaintiff had bibasilar opacities consistent with atelectasis and possible small pleural effusions, as well as "decreased prominence of interstitial markings, suggesting resolving CHF." R. at 271, 327. Plaintiff was also found to have cardiomegaly, and "increased interstitial markings, lung bases, suggesting mild pulmonary venous hypertension." R. at 329. An abdominal exam revealed cholecsystitis with gall bladder wall thickening and gall stones. R. at 330. An echocardiogram revealed "moderate [left ventricular hypertrophy] with preserved systolic function and no wall motion abnormalities" and "no significant pericardial effusion." R. at 282. In addition, Plaintiff had a catheter placed in her right common femoral vein. R. at 238.

On April 15, 2006, Plaintiff had a consultation with Dr. Mark A. Taylor ("Taylor") about managing her TTP. R. at 285-86. Plaintiff complained of pain in the epigastric area and denied any headaches. R. at 285. Taylor noted that Plaintiff was "a bit lethargic, but not confused." R. at 285. Taylor further noted that Plaintiff's tongue was midline, her breathing was non-labored, her communications skills adequate, and her strength "roughly 5/5." R. at 285-86.

On April 20, 2006, Plaintiff had an MRI. R. at 269, 325. Plaintiff was found to have an "[a]cute large infarct involving the left pons and right thamalmus and acute lacuna infarcts involving the left cerebellum and left parietal white matter." *Id.* Plaintiff was also found to have "[s]cattered periventricular white matter disease with subcortical lacunar infarcts and minimal amount of central atrophy, all chronic. *Id.* That same day, Plaintiff had a consult with Dr. Julia L. Mikell, M.D. ("Mikell") to whom Plaintiff was referred because Plaintiff had had multiple strokes. R. at 283. Mikell noted that Plaintiff: (1) "groan[ed] with each breath and [wa]s a little tachypneic" (rapid breathing); (2) had a symmetric face, midline tongue, and was swallowing well, but had difficulty looking to the left; and (3) was oriented to person, but did not know the year, month, or which

hospital she was in.   R. at 283-84.  After evaluating Plaintiff, Mikell noted:

> COORDINATION - She has more difficulty with finger nose-finger on the right, but it [wa]s not perfect on the left either.

> MOTOR - Left grip is 3/5, right grip is 2/5.  She can lift the left leg off the bed, but not the right.

> SENSORY - Not reliable.

> REFLEXES   Diminished, but she has bilateral upgoing toes.

R. at 284.  Mikell concluded:

> I am afraid she has a multi-infarct situation related to her TTP.  Whether or not it is cardioembolic is probably academic given the fact that we cannot use any anticoagulation.

> PLAN: Let's get occupation therapy, physical therapy, and speech to see her.
> . . . .

> She will likely need nursing home placement.

> This is a very sad situation.

R. at 284.

> By letter dated April 25, 2006, Taylor gave his opinion on Plaintiff's condition:

> Ms. Glover is a patent of mine who I am currently seeing while she is an inpatient at Candler Hospital.  She has a diagnosis of thrombotic thrombocytopenic purpura (TTP).  This will require a prolonged hospital stay for plasma exchange.  This is a very life-threatening condition.  She has suffered the unfortunate complication from this condition of multiple strokes.  This will ultimately leave her permanently disabled.  Additionally, while she is in the hospital, she clearly cannot meet many of her financial obligations.  Please feel free to call my office if you have any questions regarding her case.

R. at 409.

On May 12, 2006, Plaintiff was discharged from the hospital after final evaluation.  R. at

277.  It was noted that Plaintiff was receiving Rituxan "in addition to the plasma exchange" as

"second line therapy" for her TTP, which Plaintiff "tolerated . . . extremely well." *Id.*   It was also noted that Plaintiff had met her physical therapy goals in the hospital and that new goals should be set up for after discharge.  R. at 347.  Plaintiff completed reading comprehension, answering questions "with 70% accuracy with cues." R. At 358.  Plaintiff also completed math equations "with 70% accuracy independently," but needed extra time for the math.  *Id.*

On May 15, 2006, Plaintiff presented to Taylor for follow up after her discharge.  R. at 259. Taylor noted that Plaintiff was discharged from the hospital with "stable counts," had "now nearly fully recovered from" her stroke, and had no other complaints.  R. at 259. Taylor noted that no edema was present and that Plaintiff's platelet count was stable.  R. at 260.  On May 17, 2006, Plaintiff again presented to Taylor for management of her TTP. R. at 258.  Taylor noted that Plaintiff "[t]olerated her next dose of Rituxan without any infusional reaction" and had not had any bleeding.  *Id.* Plaintiff had no other complaints and no edema was present.  *Id.* On May 22, 2006, Plaintiff had another follow up visit with Taylor for her TTP.  R. at 257, 359.  Plaintiff reported that she was "doing great" and did not have any new complaints.  *Id.* Taylor noted that Plaintiff's communication was appropriate, her breathing nonlabored, and her hemoglobin and platelet counts up.  *Id.* Taylor concluded that Plaintiff's TTP was stable and that if Plaintiff maintained a stable platelet count through the next week, he would have her catheter removed.  *Id.*

On May 24, 2006, Plaintiff reported to Taylor's office to have her catheter flushed.  R. at 256.  Plaintiff reported no new problems, but it was noted that Plaintiff's "extremities [we]re 1+ with edema."  *Id.* On May 31, 2006, Plaintiff again reported to Taylor for follow up on her TTP. R. at 367. Taylor noted that Plaintiff was "continu[ing] to improve from her stroke symptoms," was ambulating without a walker, had appropriate communication, and nonlabored breathing.  *Id.*

6

Taylor concluded that Plaintiff's TTP was in remission, her catheter should be removed, and her dose of prednisone reduced to 30 mg daily. *Id.*

On June 21, 2006, Plaintiff presented to Taylor for follow up for her TTP. R. at 365. Plaintiff's only complaints were of increased swelling and elevated blood pressure. *Id.* Taylor noted that Plaintiff's mood, affect and communication were appropriate and her breathing nonlabored. *Id.* Taylor concluded that Plaintiff's TTP was stable, reduced her dose of prednisone to 20 mg, and started her on hydrocholorothiazide for her edema. *Id.* On July 7, 2006, Plaintiff presented to Taylor for followup complaining of "persistent swelling from prednisone." R. at 396. Taylor concluded that Plaintiff's TTP was in continued remission. *Id.* Taylor reduced Plaintiff's prednisone dose to 10 mg per day and scheduled a two week follow up visit. *Id.*

On July 17, 2006, Plaintiff presented to Kumjian for follow up. R. at 400. Kumjian noted that Plaintiff was in no apparent distress and that her extremities did not reveal any edema. *Id.* Kumjian concluded that Plaintiff's hypertension was "reasonably well controlled." *Id.*

On July 18, 2006, Dr. Charles T. Felton ("Felton"), a medical consultant, completed a Residual Functional Capacity Assessment on Plaintiff. R. at 383-90. Felton concluded that Plaintiff could: (1) lift twenty pounds occasionally and ten pounds frequently; (2) stand or walk for about six hours in an eight hour workday; (3) sit for about six hours in an eight hour workday; (4) push and or pull with no limitations; (5) climb ramps and stairs, balance, kneel, crouch, and crawl occasionally; and 6) not climb ladders or scaffolds. *Id.* Felton also concluded that Plaintiff had no manipulative, visual, or communicative limitations. *Id.* Felton found that Plaintiff should avoid even moderate exposure to hazards such as machinery and heights. *Id.* Felton based these findings on Plaintiff's medical records, which indicated that Plaintiff's TTP was stable and that she had

nearly fully recovered from her strokes.  *Id.*

On July 21, 2006, Plaintiff presented to Taylor for follow up on her TTP.  R. at 395.  Taylor noted that Plaintiff was down to 10 mg of prednisone per day and that she complained only of moderate fatigue.  *Id.*  Taylor determined that Plaintiff's TTP was still in remission and that she should no longer take prednisone.  *Id.*  On August 11, 2006, Plaintiff again presented to Taylor.  R. at 394.  Taylor noted that when Plaintiff had stopped taking prednisone, she had a "flare of some arthritis pain in her back and legs."  *Id.*  As a result, Taylor put Plaintiff back on prednisone at a dose of 5 mg every other day.  *Id.*  On September 14, 2006, Plaintiff presented to Kumjian for follow up.  R. at 424.  Kumjian concluded that Plaintiff's hypertension was well controlled, her renal function stable, and her platelet count normal.  *Id.*  Kumjian was "well pleased with [Plaintiff]'s progress."  R. at 425.

On October 3, 2006, George T. Keller ("Keller"), a medical consultant completed a Residual Functional Capacity Assessment of Plaintiff.  R. at 401-408.  Keller found that Plaintiff could: (1) lift twenty pounds occasionally and ten pounds frequently; (2) stand and/or walk for six hours in an eight hour workday; (3) sit for six hours in an eight hour workday; (4) push and/or pull without limitation; (5) climb ramps and stairs, balance, stoop, kneel, crouch, and crawl frequently; and (6) never climb ladders or scaffolds.  *Id.*  Keller also found that Plaintiff had no manipulative, visual or communicative limitations, but must avoid all exposure to hazards.  *Id.*  Keller based his assessment on Plaintiff's "documented improvement in impairments since initial application."  R. at 406.

On December 12, 2006, Plaintiff presented to Kumjian for follow up.  R. at 422.  Kumjian noted that Plaintiff had no new complaints, and normal breath sounds.  *Id.*  Kumjian concluded that

Plaintiff's hypertension was marginally controlled, and her renal function and stroke syndrome stable. *Id.* On December 15, 2006, Plaintiff presented to Taylor for follow up and reported that she was "doing well." R. at 414. Taylor noted that Plaintiff had been weaned off prednisone with "only minimal arthritis complaints." *Id.* Plaintiff's communication was noted as appropriate and her breathing nonlabored. *Id.* Taylor concluded that Plaintiff's TTP was in remission and instructed Plaintiff to set up an appointment with Dr. William Stephens ("Stephens") for her connective tissue disorder. R. at 414.

On June 12, 2007, Plaintiff presented to Taylor to follow up on her TTP. R. at 413. Plaintiff reported that Kumjian told her that she had 25% renal function. *Id.* Taylor noted that Plaintiff had no bleeding, fatigue, seizures or petechiae; and that Plaintiff's communication was appropriate and her breathing nonlabored. R. at 420. Taylor concluded that Plaintiff's TTP remained in remission. *Id.* Taylor also noted that Plaintiff had not yet set up an appointment with Stephens for her arthritis. *Id.* On September 28, 2007, Plaintiff reported to Kumjian that she was experiencing shortness of breath with ambulation. R. at 420. Plaintiff reported no headaches or lightheadedness. *Id.* Kumjian observed that Plaintiff had 1+ pitting edema up to both knees, which was described as "[s]ignificant bilateral [lower extremity] edema with negative Holman's sign." *Id.* Kumjian concluded that Plaintiff's hypertension was well controlled and that he was pleased with Plaintiff's progress. *Id.*

On January 25, 2008, Plaintiff presented to Taylor for follow up on her TTP. R. at 411. Taylor noted that Plaintiff had been "do[ing] very well." *Id.* Taylor concluded that Plaintiff's TTP was stable and informed Plaintiff that she would "have multiple benefits, cardiovascular, stroke and arthritis, if she were to lose weight." *Id.* Later that same day, Plaintiff presented to Kumjian for

follow up.  R. at 418-19.  Kumjian noted that Plaintiff had normal breathing, and was "doing well with resolved [lower extremity] edema," but was "[s]till having trouble getting around" and "need[ed] daily exercise and weight loss."  R. at 418-19.  Kumjian's notes state that he was overall pleased with Plaintiff's progress.  R. at 419.

On February 11, 2008, Plaintiff presented to Stephens complaining of pain in her neck, joints and muscles, as well as unsteadiness and headaches.  R. at 427.  Stephens' notes state that Plaintiff had "[n]o symptoms . . . which would suggest active connective tissue disease."  *Id.*  On February 20, 2008, Stephens stated in his notes that Plaintiff's diagnosis was still mixed connective tissue disorder, but that he did not believe a prescription was indicated.  R. at 428.

On April 28, 2008, Plaintiff presented to Kumjian who noted that she was doing well with no new complaints.  R. at 439.  Plaintiff reported no headaches, but did report having a fever the previous Sunday.  *Id.*  Kumjian observed that Plaintiff had normal breathing sounds, and "3+ pitting edema . . . up to both knees."  *Id.*  Kumjian concluded that Plaintiff had "benign essential hypertension" that was "uncontrolled with marked lower extremity edema," that her kidney disease was stable, and that Plaintiff's TTP was improved.  R. at 440.   On June 23, 2008, Plaintiff presented to Taylor for follow up on her TTP.  R. at 433.  Plaintiff reported that she had not felt very well since her last visit and that she was lethargic and  unresponsive at times.  *Id.*  Taylor did not believe that Plaintiff's complaints were related to TTP.  *Id.*

On July 29, 2008, Taylor completed a Residual Functional Capacity Assessment on Plaintiff.  R. at 430-32.  Taylor stated that Plaintiff could lift less than ten pounds occasionally and could not lift any amount of weight frequently because Plaintiff had had strokes that limited her function.  *Id.*  Taylor also stated that Plaintiff could stand or walk for two hours in an eight hour

work day, but only for 30 minutes without interruption. R. at 431. Taylor stated that Plaintiff's ability to sit was unlimited. *Id.* Taylor stated that Plaintiff could not climb, crouch, kneel or crawl at all, but could occasionally balance or stoop. R. at 431. Taylor stated that Plaintiff's ability to reach, push and pull were occasionally affected by her condition, but that her ability to handle objects, feel, see, hear, and speak were "ok." R. at 432. Taylor stated that Plaintiff had no environmental restrictions. *Id.* Taylor concluded that Plaintiff's limitations were normal for her diagnosis, that these limitations were confirmed by objective findings, and that he was not basing his opinion on Plaintiff's subjective complaints. R. at 432.

On August 12, 2008, Kumjian also completed a Residual Functional Capacity Assessment on Plaintiff. R. at 436-38. Kumjian stated that Plaintiff could only occasionally lift less than ten pounds because of "severe deconditioning, mixed connective tissue disease and TTP." *Id.* Kumjian stated that Plaintiff could stand or walk less than one hour per day and could sit for less than one hour per day. *Id.* Kumjian stated that Plaintiff can never climb, stoop, crouch, kneel, or crawl, but can occasionally balance. R. at 437. Kumjian also stated that Plaintiff is impaired in reaching, handling, feeling pushing and pulling, and severely limited in environmental restrictions. *Id.* Kumjian concluded that Plaintiff's limitations are normal for the severity of her diagnosis, that the diagnosis is confirmed by objective findings, and that the restrictions are not based upon Plaintiff's subjective complaints. R. at 438.

## C.    Administrative Hearing

At the administrative hearing, Plaintiff testified that during the day she washes clothes, "straighten[s] up a little," watches television, reads, does crossword puzzles, fixes her meals, dresses herself, and received visits from family members. R. at 34-35, 37, 38. Plaintiff testified

that she also goes to yard sales "every now and then," sometimes goes grocery shopping or to Wal-

Mart, and Plaintiff had recently taken a trip to North Carolina for a graduation.  R. at 35, 37, 38.

Plaintiff testified that she can walk with a cane "about ten minutes or so" before she has to sit down

and rest. R. at 55.  Plaintiff also testified that she cannot "do a lot of standing" because she has

aches and pains in her knees and legs.  R. at 41-42.  Plaintiff testified that she does not drive

anymore, does not climb stairs, and does not "do any lifting at all" except for "pots and other little

things."  R. at. 44.  With regard to her condition, Plaintiff testified that she takes Tylenol for her

aches and pains, as well as for headaches, which she gets about once a week.  R. at 42, 43, 50-51.

Plaintiff also testified that she is "drowsy sometimes."  R. at 43.  Plaintiff testified that she has not

been put on dialysis for her kidneys and that she was pretty stable at the time of the hearing.  R. at

50.

  Plaintiff confirmed that she worked as a draper and testified that in her past work she "did

custom window treatments and pillows and bed treatments and whatever."  R. at 30.  Plaintiff also

testified that she was an independent contractor.  *Id.*

  Dr. Brown ("Brown"), a vocational expert also testified at the administrative hearing.

Brown testified that the best classification for Plaintiff's prior work was sewing machine operator,

DOT[1] 787682066, which is semiskilled, light work with a specific vocational preparation of 3.  R.

at 61.  Brown testified that this classification "encompasses somebody who does draperies, sewing

bedspreads, pillowcases, the full range of work that [Plaintiff]- - . . . - - testified to."  *Id.*  Brown

testified that DOT 18 - drapery worker, which Plaintiff's representative referenced is "for someone

who is exclusively working as a drapery sewer" and [i]t's the same exertional level [as sewing

---

[1]  Dictionary of Occupational Titles.

machine operator] in the DOT with - - . . . - - a 3. It's an SVP of 4, which still puts it in the

semiskilled range." R. at 62.

The ALJ stated the following hypothetical to Brown:

. . . assume an individual who is age 53. . . . With a high school education and past
relevant work as you've described it. And for my first question please assume that
the individual can perform the exertional demands of light work. In other words,
can lift occasionally up to 20 pounds, frequently 10 pounds, and can sit, stand or
walk for a total of six hours in an eight hour workday and each of those no more
than two hours at a time. And then assume further that the individual can only
occasionally perform the range of postural activities such as climb, balance, stoop,
kneel, crouch and crawl. And could never climb ladders, ropes or stairs. And
would have to avoid hazards. Hazardous working condition. Under these
circumstances, could the individual return to any - - to past - - to her past relevant?

R. at 62. Brown testified that the individual could return to her past relevant work. *Id.*

### D.    ALJ's Decision

The ALJ made the following findings in his decision denying benefits:

1. The claimant meets the insured status requirements of the Social Security Act
through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since April 13, 2006,
the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and
416.971 *et seq.*).

3. The claimant has the following severe impairments: thrombotic thrombocytopenic
purpura (TTP) and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments, that
meets or medically equals one of the listed impairments in 20 CFR Part 404,
Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),
416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the
claimant has the functional capacity to perform light work as defined in 20 CFR
404.1567(b) and 416.967(b). Light exertional work is described by the
Commissioner of the Social Security Administration as requiring lifting and carrying
20 pounds occasionally and 10 pounds frequently as well as an ability to sit, stand,

and walk for 6 hours in an 8-hour work day. The claimant is limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling, no climbing of ropes, ladders, or scaffolds, and avoiding concentrated exposure to hazardous environments and dangerous machinery.

6. The claimant is capable of performing past relevant work as a pillowmaker. This work does not require the performance of work-related activities precluded by the claimants residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 13, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

R. at 12, 13, 14, and 19.

In determining Plaintiff's residual functional capacity, the ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." R. at 15. The ALJ gave Taylor's opinion that claimant was permanently disabled due to her TTP and strokes little weight finding this opinion "inconsistent with the weight of the evidence." R. at 17. In support of this finding, the ALJ stated:

> Although the claimant was diagnosed with a very serious illness, which if untreated would have caused much greater functional loss, this condition was brought under control with plasmaphoresis and through other means. The claimant's platelet counts stabilized by May 2006, after which time, she required and sought little treatment and her condition remained in complete remission. As for the claimant's strokes, the claimant had fully recovered by May 2005,[2] and there is no evidence of significant residual effects of her strokes. Additionally, the final responsibility for deciding whether a claimant is disabled is a determination reserved for the Commissioner as outlined in 20 CFR §§ 404.1527 and 416.927.

R. at 18. The ALJ stated that he did not fully credit the residual functional capacity assessments of Taylor and Kumjian because they were "not supported by objective evidence and they are inconsistent with their own treatment records." R. at 18. In support of this finding, the ALJ noted

---

[2]    The court concurs with the Magistrate Judge that the year 2005 is a typographical error and that the ALJ meant 2006.

14

that: (1) "claimant required and sought little treatment for her TTP after May 2006;" (2) claimant's TTP "has remained in complete remission;" and (3) when "claimant did seek treatment, there was not much in the way of objective findings to support" such a restrictive residual functional capacity." R. at 18. The ALJ further noted that Taylor and Kumjian appeared to have only offered their medical opinions as to Plaintiff's functional capacity at the request of Plaintiff and her representative, and that the relationship between the doctors and Plaintiff may have motivated the doctors to complete the forms in a manner favorable to Plaintiff. *Id.* After considering these opinions, the ALJ determined that they did not warrant controlling weight. In addition, the ALJ considered the opinions of non-examining state agency physicians, which indicated that Plaintiff could perform a reduced range of light work, which opinions he gave "some weight." *Id.*

With regard to Plaintiff's past relevant work, the ALJ's decision states:

> The vocational expert testified that while there was no specific description in the Dictionary of Occupational Titles for pillow maker, this occupation would qualify as a sewing machine operator (DOT# 787-682-066), which is defined by the Dictionary of Occupational Titles as semi-skilled in nature and which requires light exertion. The vocational expert specifically testified that the above mentioned residual functional capacity accommodates the requirements of her past relevant work.

> In comparing the claimant's residual functional capacity with the physical and mental demands of her work, the undersigned finds that the claimant is able to perform this job as she actually performed it and as it is performed generally in the national economy. The vocational expert confirmed that his testimony is consistent with the Dictionary of Occupational Titles.

R. at 19.

## II. STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides that "[t]he findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes a *de novo* review of the factual circumstances that substitutes the court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971). The court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). However, the Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### III.  THE APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a). Disability is defined in 42 U.S.C. § 423(d)(1)(A) as: "[the] inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Social Security Act has, by regulation, reduced the statutory definition of "disability" to a series of five sequential questions that are to be asked during the course of a disability determination.  The five questions are: (1) is the claimant engaged in substantial gainful activity; (2) does the claimant have a severe impairment or combination of impairments; (3) does the claimant have an impairment that meets or equals one of the listings in the appropriate appendix; (4) is the claimant prevented by the impairment or combination of impairments suffered from engaging in his or her relevant past employment; and (5) does the claimant have the ability to engage in other gainful activity considering his or her age, education, past relevant experience, and residual functional capacity.  *See* 20 C.F.R. § 404.1520 (2007).  An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work.  In such a case, no further inquiry is necessary.

## IV.  DISCUSSION

**A.     Medical Opinions**

Plaintiff objects to the Magistrate Judge's recommendation that the decision of the ALJ be affirmed stating that "the Magistrate did not specifically address the concerns of the Plaintiff as stated in the initial brief that the ALJ . . . ignored the medical evidence supporting the opinions" of her treating physicians.  Pl. Obj. at 1.

Regulations require that all medical opinions in Social Security cases be considered by the Commissioner.  20 C.F.R. § 416.927(b).  "[A] treating physician's opinion on the nature and

17

severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Masto v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (citing 20 C.F.R § 416.927); *see also* 20 CFR 404.1527(d)(2). However, ALJ's have "the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Id.* (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)("if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). If an ALJ's assessment of a person's residual functional capacity ("RFC") "conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96-8p, 61 Fed. Reg. 344-01, 34478.

Regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d) (2)-(5).

While the Social Security Administration must consider opinions from medical sources regarding whether a claimant is disabled, the final determination rests with the Commissioner and no special weight is attached to medical opinions as to the ultimate issue of disability. 20 C.F.R. § 404.1527(e)(2), (3). *See also Morgan v. Barnhart*, 142 F. App'x 716, 721-22 (4th Cir. 2005) ("ALJ is under no obligation to give a treating physician's legal conclusions any heightened evidentiary

value."). An ALJ cannot ignore the opinion of a treating physician, but must evaluate all of the evidence to decide the extent to which the treating physician's conclusion is supported by the record. *Morgan*, 142 F. App'x at 722.

With regard to Taylor's opinions, Plaintiff contends that "Taylor's assessment is not inconsistent with the treatment evidence, and is very similar to the other primary opinion evidence in the case. . . ." Pl. Obj. at 5. In support of Taylor's opinions, Plaintiff points to: (1) her medical records from Mikell; and (2) Plaintiff's treatment records from her hospitalization in May 2006. *Id.* at 3-4. Plaintiff contends that Taylor's records do not provide detailed information about her recovery from the strokes because Taylor "was not treating [Plaintiff] for the residuals of her strokes. . . ." *Id.* at 4-5. In addition, Plaintiff contends that her means of obtaining follow-up treatment was limited due to her lack of insurance coverage. *Id.* at 4. Plaintiff contends that "had the ALJ wished to dismiss [Taylor's] opinion for the reasons cited he should have specifically acknowledged all of the evidence . . . as well as recontacted the doctor for an explanation of the opinion instead of just dismissing it out of hand." *Id.* at 5.

After careful review, the court finds that a reasonable mind could accept the record as adequate to support the ALJ's determination to afford Taylor's opinions less than full credit. This is because Taylor's opinions are contradicted by persuasive evidence. Contrary to Plaintiff's contention, Mikell's records and Plaintiff's hospital records provide little support for Taylor's opinions as to Plaintiffs functional limitations. Mikell last evaluated Plaintiff on April 20, 2006 and Plaintiff was discharged from the hospital on May 12, 2006. Taylor's notes on Plaintiff after her discharge from the hospital indicate that Plaintiff made substantial improvements. Taylor's notes from May 15, 2006 state that Plaintiff had "almost fully recovered" from her strokes and had a stable

19

platelet count.  R. at 259.  On May 31, 2006, Taylor noted that Plaintiff continued to improve.  R. at 367.  These facts also illustrate the inconsistency found by the ALJ between Taylor's opinion and Taylor's treatment records.  In addition, the ALJ properly noted that Taylor's records on Plaintiff contain little evidence of objective findings supportive of his opinion as to Plaintiff's functional capacity.

With regard to Kumjian's opinions, Plaintiff contends that the ALJ considered Kumjian's opinion in concert with Taylor's and "reiterates her arguments" in that regard.  Pl. Obj. at 8.  Plaintiff also contends that the ALJ's decision made no mention of positive findings supporting Kumjian's opinion, such as Kumjian's findings that Plaintiff has lower extremity edema.  *Id.*

As with the opinion of Taylor, the court finds that a reasonable mind could accept the record as adequate to support the ALJ's determination that Kumjian's opinion as to Plaintiff's functional capacity was not entitled to full credit.  Kumjian's stated basis for his assessment was that Plaintiff had "severe deconditioning, mixed connective tissue disorder, and TTP."   However, Kumjian's opinions are contradicted by persuasive evidence.  The ALJ properly noted that: (1) Kumjian's records contain few objective findings supportive of his opinions; and (2) Kumjian's opinions are inconsistent with his treatment records.   Kumjian's records indicate that Plaintiff has been progressing and provide little evidence of "severe deconditioning."  Although Kumjian's notes indicate that Plaintiff suffers from edema on some occasions, they also indicate that Plaintiff has recovered from this condition in the past.  R. at 418-19.  Moreover, Dr. Stephens and Taylor, who follow Plaintiff for mixed connective tissue disorder and TTP respectively, have indicated that these conditions are under control.  R. at 428, 411.

**B.      Past Relevant Work**

Plaintiff objects to the Magistrate Judge's conclusion that the ALJ properly determined that Plaintiff was able to perform her past relevant work. Pl. Obj. at 9-14. Specifically, Plaintiff contends that the Magistrate Judge's conclusion that the ALJ "reasonably classified Plaintiff's past work as a 'pillow maker'" is not supported by the evidence, and even if the Magistrate were correct, the ALJ would still be required to analyze the Plaintiff's description of the work and consider that in detail." *Id.* at 14. The court disagrees.

A claimant bears the burden of demonstrating that her impairment prevents her from performing past relevant work.[3] *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). If a claimant can perform past relevant work either as she performed it or as it is generally performed in the economy, the claimant is not disabled within the meaning of the Act. SSR 82-61. SSR 82-62 requires ALJs to consider past work experience carefully to ensure that the facts support his or her conclusion regarding the claimant's ability or inability to perform past work.

As was noted by the Magistrate Judge, the vocational expert testified that Plaintiff's past work would be classified as a sewing machine operator, a semi-skilled, light exertional job. The hypotheticals put to the vocational expert support the ALJ's conclusion that Plaintiff retained the functional capacity to perform her past relevant work as it is generally performed in the national economy. The ALJ's labeling of Plaintiff's past relevant work as a pillowmaker, while imprecise, does not change the fact that the ALJ's finding that Plaintiff could return to past relevant work is supported by substantial evidence.

---

[3]       Past relevant work is work that a social security claimant has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1).

## CONCLUSION

The Report and Recommendation of the Magistrate Judge is adopted and incorporated herein by reference.  The Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
Margaret B. Seymour
United States District Judge

August 16, 2011
Columbia, South Carolina